56  571
80  337
80  403
80  407
56  571
c106 416
106  667
56  571
140  187

# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT,

## NOVEMBER SESSION, 1880.

[No. 6,061.—In Bank.]

### NEMIE OSGOOD v. THE EL DORADO WATER AND DEEP GRAVEL MINING COMPANY.

WATER RIGHTS — APPROPRIATION — NOTICE — ABANDONMENT. —If an appropriator of water, after duly posting his notice, and while diligently prosecuting the work of appropriating the water, posts a second notice of appropriation of the same water, he does not thereby abandon his first claim.

ID.—ID.—ID.—Notices of appropriation of water are to be liberally construed.

ID.—ID.—PUBLIC LANDS.—The principle of prior appropriation of water on the public lands in California, where its artificial use for agricultural, mining, and other like purposes is absolutely essential, which has all along been recognized and sanctioned by the local customs and decisions, was expressly recognized by Act of Congress of July 26th, 1866.

ID.—ID.—ID.—PATENT.—If a person acquires a vested right to appropriate water upon the public lands of the United States, prior to the issuance of a patent granting to another any portion of the public lands, the patentee's rights are, by express statutory enactment, subject to the rights of the appropriator.

ID.—ID.—The question, whether a person has made a valid appropriation of water, depends on the questions, whether he has given a proper notice of his intention to appropriate it, and whether he has prosecuted the work in that behalf with reasonable diligence.

ID.—ID.—RELATION.—If a person gives sufficient notice of his intention to appropriate water, and prosecutes the work with reasonable diligence, on the completion of the work, his rights relate back at least to the commencement of the work.

ID.—ID.—ID.—PRE-EMPTOR.—In a question of priority of right between an appropriator of water on the public lands and a pre-emptor, the rights of the latter date from the issuance of his patent; and the latter makes no

case for the application of the doctrine of relation by proving, that, prior to said date, he settled on the land, and that the United States surveyor surveyed the same, and that he filed his declaratory statement, and proved up and paid for the land.

Appeal from a judgment for the defendant, and from an order denying a motion for a new trial, in the Eleventh District Court, County of El Dorado. Wheeler, J.

*T. B. McFarland*, for Appellant.

As against a specific grant by patent, conveying the land and the stream as a parcel of it, no right claimed under a general law of Congress can prevail. The word " possession," in § 9 of the Act of Congress of July 26th, 1866, means actual possession, and not a mere notice of intention to appropriate. (U. S. Stats. at Large, vol. 14, p. 253.) The said Act of Congress is intended to regulate rights only as between naked appropriators of the public domain—not as against owners in fee. Said act only provides for rights which are " recognized and acknowledged by the local. customs, laws, and decisions of courts." But the right to divert water from a *riparian owner* has never been recognized by customs, laws, or decisions of courts in this State. On the contrary, all the decisions of this Court as to acquiring water by naked. appropriation have been based on the fact that the water was on the public domain, and that there were no riparian owners to complain. (*Irwin* v. *Phillips*, 5 Cal. 146; *Tartar* v. *Spring Creek W. & M. Co.* 5 id. 398; *Stoakes* v. *Barrett*, 5 id. 39; *Conger* v. *Weaver et al.* 6 id. 548; *Crandall* v. *Woods*, 8 id. 140; *Kelly* v. *Natoma W. Co.* 6 id. 108; *Leigh* v. *Independent Co.* 8 id. 323; *Vansickle* v. *Haines*, 7 Nev. 255.)

These early decisions have not been changed or enlarged by later cases.

Moreover, the statute law of this State expressly provides, that there shall be no right to water by appropriation as against a riparian owner. (Civ. Code, § 1422.) The said Act of Congress was intended to apply only to mineral lands. It was only intended to confirm such appropriation of water as had been made at the time of its passage.

Appellant's rights commenced when he settled in 1863, and

certainly as early as the filing of his declaratory statement, June 11th, 1868. (*Yosemite Valley Case*, 15 Wall. 87–93 ; U. S. Stats. vol. 16, p. 218, § 17.) The last citation shows, that the law requiring patents to contain reservations of water rights was not passed until July 9th, 1870—after Osgood had made proof and payment.

Osgood Creek is a distinct stream, flowing easterly into the State of Nevada, and is unconnected, naturally, with any water system which drains westerly through the American River ; therefore evidence of work done by respondent on its ditch leading from the American River, west of the mountains, by which it sought to monopolize all the streams and lakes of an immense region on the westerly side of said mountains, was improperly admitted and allowed to be considered as work done on Osgood Creek. The only work that should have been considered was that done on the dam, ditch, and tunnel, by which Osgood Creek was diverted ; and there is no pretense that any work was done on *that ditch* until the summer of 1872—long after Osgood had his patent.

But assuming that work done by respondent on its vast system of water claims on the west slope of the mountains could be considered as work done on Osgood Creek, still the evidence shows that respondent and its grantors posted their notices in 1856, but did no real work anywhere until 1871—fifteen years afterwards. This was not prosecuting the work with any diligence whatever. They posted their notice on Osgood Creek in 1860, but did no work whatever there until 1872.

*George J. Blanchard*, and *Garber, Thornton & Bishop*, for Respondent.

The rights *prima facie* granted to appellant by his patent are limited and destroyed, so far as the water is concerned, by the proof of appropriation by defendant and its grantors, under the provisions of the Act of Congress of July 26th, 1866, for the reasons set forth in the charge of the Court to the jury. Under the provisions of the Act of Congress, the same rights are accorded to defendant as against plaintiff, that defendant could have asserted in the courts, had no patent ever been obtained,

and no pre-emption claim ever been made or acquired by plaintiff.

Plaintiff acquired whatever rights he did acquire, subject and in subordination to all the claims and rights which defendant and its grantors ever had, or would have been allowed against a mere possessor in the absence of all legislation and action on the part of Congress, or any department of the General Government. (Act of July 9th, 1870; *Titcomb* v. *Kirk*, 51 Cal. 294.) It follows, that the patent did not convey, or purport to convey, the stream, or any other property or right, already the subject of a valid claim under the local laws, customs, and decisions, whether such claims had been perfected or became good by relation. No valid inchoate right thus sanctioned could be taken away, or its perfection prevented, by any act of any of the executive officers of the land department. All such under this act were vested rights; none other were contemplated. Under the local rules, customs, and decisions, the party putting up notices and proceeding with due diligence was always deemed the possessor, and the word "possession" in the Act of Congress applies to cases like this. (*Kimball* v. *Gearhart*, 12 Cal. 29.) The Act of Congress is not confined to mineral lands—such is not its letter: surely such is not its spirit, scope, or purpose. It was designed to protect just such claims as *ours* from destruction by those disposed to take advantage of a supposed possibility (now fortunately rendered an impossibility) of perverting an old technical rule of the common law to the accomplishment of results never contemplated by its authors.

Whatever rights appellant acquired—and we contend they only embraced the premises subject to our claim to the water—commenced only at the date of his patent: certainly not earlier than the time when he proved and paid up.

The waters of Echo Lake and Osgood Creek formed parts of the same system, and work done by defendant on one was equally a prosecution of the work of appropriation as if done on the other.

Ross, J.:

It appears from the record, that, in the year 1856, a man by the name of Kirk conceived the idea of constructing a canal

from the vicinity of Placerville, in El Dorado County, for the purpose of conducting water from various sources of supply in the Sierra Nevada Mountains to the foothills and plains below, for mining, agricultural, and other useful purposes. There were many obstacles in the way of the undertaking; for the country through which the waters had to be conducted was, in great part, rough and mountainous, and the winters so severe that the working season consisted of some five months only. According to Kirk's testimony, he made, in 1856, a survey for the canal, and also a survey of Silver Lake, Clear Lake, and Silver Creek, posted notices claiming their waters, and did other work—all at a cost of about $1,000. In 1858, he ran the lines over, with a party of engineers, from "Coon Hollow," a point about three-quarters of a mile south of Placerville, to the mouth of Alder Creek, on the American River, stuck a stake every chain, cut the brush out, made benches about every half mile, and located a reservoir site about seven miles above "Coon Hollow." Rain and snow then coming on, further work was postponed. The line so run was about sixty miles long, and cost about $1,500. In 1860, Kirk prospected the country for a shorter and better line. He then commenced a bench at the mouth of Alder Creek, and ran the line up to Cedar Rock, on the American River, where he located a dam, contracted for lumber to construct the flume and gates, employed men to get out timbers for the dam, and had a large pile of drift-wood cut out of the river, in order to run the water into the head of the ditch. In the same year, 1860, he located, among other lakes, Echo Lake, by posting a notice at its outlet, where the present ditch commences, "claiming it as a reservoir to keep the water back to supply this ditch, which is built on this line, located in the year 1860, and also claiming the waters of the lake for the purpose of supplying this present line of ditch"; that is to say, the ditch of the defendant as finally completed, and which was finally located by Kirk in 1860. At that time, 1860, the work consisted of the line from Sportsman's Hall (in the vicinity of Placerville) to Cedar Rock, from the latter point to Silver Lake, and thence to Clear Lake; and from Cedar Rock up the American River to Audrian's Lake, Echo Lake, and Slippery Ford Lake. After the passage of the Act of Congress of July

23rd, 1866, to wit, in February or March, 1867, Kirk posted at Echo Lake a notice, of which the following is a copy :

" In conformity with an Act of Congress entitled ' An Act granting the right of way to ditch and canal owners over the public lands, and for other purposes,' approved July, 1866, the undersigned hereby claim, and are by priority of possession entitled to, the use of the water of this stream for mining, manufacturing, agricultural, and other purposes, and intend to dam said stream, and carry the same or a portion thereof in a flume, ditch, or canal, or by natural channels, wherever found suitable, to certain mining and agricultural districts, and that the construction of said flume or ditch will not injure any settler on the public domain.                                     " J. KIRK,

" February, 1867.                      " F. A. BISHOP."

Prior to the posting of this last-mentioned notice, which was a printed one, Kirk had conveyed one-half of his interest in all the works and waters to Bishop. In 1868, he (Kirk) worked on the lower end of the canal, and on the upper end of it in 1870. In July, 1871, he completed the dam at Cedar Rock, and turned into the head of the ditch all the water there was in the river. The same year, 1871, he had men at work digging the ditch at Sportsman's Hall, three or four miles of which were dug that and the next year. He worked on the canal every season from 1868 until the defendant's purchase of the canal, works, and water rights, which was in September, 1873. From 1869 to July, 1871, he expended over $10,000 in the construction of the canal, and from 1868 to the time of the sale to the defendant in 1873, he and Bishop expended $20,000 in its construction. In the spring of 1871 he put six or eight men at work constructing a dam at Silver Lake, and they continued to work on it every season. In April or May, 1872, he posted another notice at the outlet of Echo Lake, claiming its waters, and also a like notice at Silver Lake, Cedar Rock, and other points. In the spring of 1872 he commenced work on the canal at the outlet of Echo Lake, where he put in a small dam, and some men at work grading the ground for a flume, in order to conduct the water of this lake into the American River above the dam of Cedar Rock. This work, as also the work done at Silver Lake and Cedar Rock, was a portion of the canal as now

completed.   The waters of Echo Lake were thus taken into the American River, and from that into the main canal at Cedar Rock.   The line of ditch as now constructed from Echo Lake and Silver Lake to Sportsman's Hall was first located and determined in 1860.   With the exception of the winters and rainy seasons, when it could not be performed, the work was constantly prosecuted from the spring of 1870 until it was completed.   The ditch from Cedar Rock to Sportsman's Hall was projected and constructed for the purpose of taking the waters of Echo Lake, Silver Lake, and the other waters mentioned, and would not have been constructed but for that purpose.

The foregoing is the substance of Kirk's testimony, considered, as we must consider it, in view of the verdict and judgment in defendant's favor, in its most favorable light.   In some respects, his testimony is supported by other evidence in the case, and in some respects it is not; but the jury and the Court below pronounced in its favor, and we must accept it as true.

After the purchase by defendant, work upon the canal and its branches was vigorously prosecuted, and was completed in the year 1876, at great expense.   Upon its completion, the defendant diverted, through and by means of it, the water of Echo Lake, except a small portion which was permitted to flow down its natural channel.

For this diversion, the plaintiff, on the 3rd of August, 1876, commenced the present action to restrain defendant from diverting any of the water of Echo Lake, basing his right to the relief sought upon the alleged facts, that he (plaintiff) is the owner in fee of a certain tract of land through which the said water in its natural course flows, and that, as riparian proprietor, he is entitled to the uninterrupted and undiminished flow of the water in its natural course.   The evidence on behalf of the plaintiff shows a patent issued to him by the Government of the United States, under date of October 25th, 1871, which recites, that, whereas, full payment for the land described has been made by plaintiff, according to the provisions of the Act of Congress of the 24th of April, 1820, entitled "An Act making further provisions for the sale of the public lands," * * "the United States of America, in consideration of the premises, and in conformity with the several Acts of Congress in such cases

made and provided, have given and granted, and by these presents do give and grant, unto the said Nemie Osgood, and to his heirs, the said tract above described, to have and to hold the same, together with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging, unto the said Nemie Osgood, and to his heirs and assigns forever."

The land described in the plaintiff's patent is a tract one mile in length and a quarter of a mile in width, and is so located that the water flowing from Echo Lake, in its natural course, enters its upper boundary about one mile from the outlet of the lake, and passes through the entire length of the tract, uniting, however, before leaving it, with the waters of the Little Truckee River. The plaintiff first went upon this land in the year 1863, as a toll-gather on a certain toll-road. The same year, he also commenced raising stock, but the collection of tolls was his principal business. From that date, he has resided on the land with his family, except during the winter seasons, which are long, and too severe for a residence there. When the plaintiff first went upon the land, it was public unsurveyed land of the United States. At the trial, he testified: "The United States surveyor first commenced to survey there in 1865. I filed my declaratory statement in the local United States land office at Sacramento, claiming this land as a pre-emptor, on the 11th day of June, 1868. I proved up and paid for the said land in said office on the 22nd day of June, 1870."

On this showing, the plaintiff seeks to invoke the doctrine of relation; but for obvious reasons, no case was made for the application of that doctrine. (*Megerle* v. *Ash*, 33 Cal. 74; *Daniels* v. *Lansdale*, 43 id. 41; *Smith* v. *Athern*, 34 id. 574; *Lansdale* v. *Daniels*, 10 Otto, (U. S.) 118.) The plaintiff's rights must, therefore, be held to have attached on the 25th of October, 1871, the date of the issuance of his patent. But at that date, according to the testimony of Kirk, and of Bishop as well, the grantors of the defendant were in the active prosecution of the work on the canal, for the diversion, among others, of the waters of Echo Lake. Whatever may be said upon the question as to whether, all things considered, the defendant's grantors prosecuted the work with reasonable diligence from its inception, we think there can be no doubt that there is evidence in the record tending to

show reasonable prosecution of the work, from at least the spring of 1870 until its completion, which testimony the jury, by their verdict, found to be true. This was a question for the jury, and we cannot say that the evidence does not sustain their finding in this respect. The question of notice was also one for the jury. Kirk testified, that, by the notice posted by him at Echo Lake, in 1860, he claimed the waters of the lake for the purpose of supplying the ditch as finally located in 1860, and as finally completed by the defendant, and also claimed the lake as a reservoir to hold the water for the purpose of supplying the ditch. According to his testimony, he had also, at that time, surveyed and finally located the line of ditch from Sportsman's Hall to Cedar Rock, and from thence, among other branches, a branch to Echo Lake ; and the line so surveyed and located was marked by stakes, the blazing of trees, etc. Thereafter, he performed, from time to time, work upon the canal at considerable cost, but whether with sufficient diligence, had other rights intervened, need not be determined. After the passage of the Act of Congress of July 26th, 1866, the ninth section of which declared, that " whenever, by priority or possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes have vested and accured, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same ; and the right of way for the construction of ditches and canals, for the purposes aforesaid, is hereby acknowledged and confirmed "—Kirk posted at Echo Lake a printed notice, a copy of which has been already inserted in this opinion. This notice was posted by Kirk in 1867, and about the same time he posted a similar notice at the other sources of supply, all of which were at that time claimed by himself and Bishop, the latter having then acquired one-half of Kirk's interest.

We discover nothing in the notice of 1867 indicating, on the part of Kirk and Bishop, any intention to abandon their claim to the waters in controversy. The same may be said of the notice posted by them in 1872. The fact of posting the notices was an *assertion* of their claim, not an abandonment ; and by all the authorities the notices are to be liberally construed. Leav-

ing out of consideration the notice of 1860, by that of 1867 the plaintiff, or any other inquirer, would have seen that Kirk and Bishop claimed to be entitled to the waters of Echo Lake, for mining, manufacturing, 'agricultural, and other purposes, and, that they intended to dam the stream, and take the water, for the purposes mentioned, in a flume, ditch, or canal, or by natural channels wherever found suitable. Looking further, he would have seen the proposed ditch staked and marked upon the ground, as finally completed, and through which the water was, in fact, finally diverted. It was for the jury to say whether the testimony introduced on the part of the defendant was true. If true, it was sufficient, in our opinion, to sustain the finding, that the grantors of the defendant gave notice of their intention to appropriate the waters of Echo Lake. (*Kimball* v. *Gearhart*, 12 Cal. 28.) This water belonged to the Government of the United States, and was, by the local customs, laws, and the decisions of the courts, subject to appropriation for the purposes for which the defendant's grantors sought to appropriate it. And the Supreme Court of the United States, in *Broder* v. *Water Co.*, 11 Otto, 275, declared it to be the established doctrine of that Court, " that rights of miners, who had taken possession of mines and worked and developed them, and the rights of persons who had constructed canals and ditches to be used in mining operations and for purposes of agricultural irrigation, in the region where such artificial use of the water was an absolute necessity, are rights which the Government had, by its conduct, recognized and encouraged, and was bound to protect before the passage of the Act of 1866 "; and the Court adds: " We are of opinion, that the section of the Act which we have quoted (the ninth section) was rather a voluntary *recognition of a pre-existing right of possession*, constituting a valid claim to its continued use, than the establishment of a new one."

The principle of prior appropriation of water on the public lands in California, where its artificial use for agricultural, mining, and other like purposes is absolutely essential, which has all along been recognized and sanctioned by the local customs, laws, and decisions, was thus expressly recognized and sanctioned by the Supreme Court of the United States, and also by the Act of Congress of 1866. And, in keeping with this policy,

Congress further provided, in § 17 of the amendatory Act approved July 9th, 1870 (Copp's Mining Decisions, 1873–74, p. 296), " that all patents granted, or pre-emptions or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the ninth section of the act of which this is amendatory," to wit, the Act of July 26th, 1866.

The defendant's grantors, therefore, had the right to appropriate the water in controversy, and if they acquired a vested right therein prior to the issuance of the plaintiff's patent, the plaintiff's rights, by express statutory enactment, are subject to the rights of the defendant. This of course depends on the question, whether the grantors of the defendant made a valid appropriation of the water, and this, in turn, on the question, whether they gave proper notice of their intention to appropriate it, and, if so, whether they prosecuted the work in that behalf with reasonable diligence. If they gave sufficient notice, and prosecuted the work with reasonable diligence, there can be no doubt that, on the completion of the work, their rights related back, at least, to the commencement of the work. In this case, the jury found in favor of the defendant on both propositions, and, as observed already, in view of the verdict, we think there is sufficient evidence of notice, and of due diligence in the prosecution of the work from a date anterior to the acquiring of any rights by the plaintiff. We think, further, from the whole record, that substantial justice has been done by the jury and the Court below between the parties litigant.

The view we have taken of the case renders it unnecessary to consider the other questions which have been elaborately and very ably argued by the learned counsel for the respondent.

Judgment and order affirmed.

Myrick, J., Sharpstein, J., and Morrison, C. J., concurred.

McKinstry, J., and Thornton, J., dissented.