BRADLEY et al. v. FALLBROOK IRRIGATION DIST. et al.

(Circuit Court, S. D. California. July 22, 1895.)

No. 553.

1. FEDERAL COURTS—EFFECT OF STATE DECISIONS—VALIDITY OF STATE LEGISLATION UNDER THE FEDERAL CONSTITUTION.

Decisions by the supreme court of a state that certain state legislation is not in contravention of the constitution of the United States, while entitled to the greatest respect, do not absolve the federal courts sitting within the state from the duty of exercising an independent judgment upon the same question.

2. SAME—QUESTIONS OF GENERAL LAW—EMINENT DOMAIN.

The federal courts are not conclusively bound by decisions of the state supreme courts that certain uses for which private property is to be taken under state legislation are public uses, and so within the power of the state in respect to the appropriation of private property. Nor are the fed-

eral courts bound by a legislative declaration in the statute by which the appropriation is authorized to be made that the use is a public use.

3. EMINENT DOMAIN—WHAT IS PUBLIC USE—IRRIGATION LAWS.

The taking of private property within limited districts organized as irrigation districts under a state law (St. Cal. 1887, p. 29), for the purpose of furnishing water to the landowners alone, and not for the general use on equal terms of all inhabitants of the district, is not a public use such as will legally justify the exercise of the power of eminent domain.

4. CONSTITUTIONAL LAW — DUE PROCESS — ASSESSMENTS FOR LOCAL IMPROVEMENTS—IRRIGATION LAWS.

A state statute providing for the creation of irrigation districts of such extent as to comprise lands susceptible of one mode of irrigation, from a common source and by the same system of works, upon the petition of 50 or a majority of the landowners therein, confirmed by a vote of two-thirds of the qualified voters residing within the district, with power to issue bonds, levy assessments to pay the same, and to condemn lands for the construction of canals, works, etc., cannot be sustained under the power to make assessments for local improvements, where the county supervisors to whom the petition is to be addressed have no authority to adjudicate upon the merits thereof, and no opportunity is given to land-owners to contest the validity of the petition, or the proceedings thereunder, which may finally result in the taking of private property. Such a statute is invalid as authorizing the taking of private property without due process of law; nor can this fatal defect in the foundation of the proceedings be cured by the fact that each landowner is entitled to be heard in determining the valuation of his land for purposes of assessment, or by the fact that, by an amendatory act (St. Cal. 1889, p. 212) the board of directors of an irrigation district are, in their discretion, authorized to institute a special proceeding in the courts to determine the validity of the proceedings, previously had, organizing the district, on publication of notice, and with the right in any person interested to appear and contest the same.

Lee & Scott and Chapman & Hendrick, for complainants.
Aitken & Smith, for defendants.

ROSS, Circuit Judge. This is a suit in equity, by which it is sought to have enjoined the execution of a deed for certain land of the complainant Maria King Bradley under a sale made by the collector of the defendant irrigation district, to satisfy a delinquent assessment against the property levied under and by virtue of the provisions of an act of the legislature of the state of California, and its amendments, known as the "Wright Act" (St. 1887, p. 29; St. 1889, pp. 15–18, 212, 213; St. 1891, pp. 53, 142, 145, 147, 244), providing for the organization and existence of irrigation districts, and to obtain a decree adjudging the proceedings under that legislation, in so far as concerns the property of the complainant Maria King Bradley, void and of no effect. The regularity of the proceedings under the act is not questioned, and as the supreme court of the state has sustained its validity in a number of cases hereinafter referred to, and as the statute itself makes the deed executed pursuant to its provisions (except as against actual fraud) conclusive evidence of the regularity of all the proceedings from the assessment to the execution of the deed, and declares that it conveys to the grantee the absolute title to the lands described therein free of all incumbrances,

except when the land is owned by the United States or this state, in which case it is prima facie evidence of the right of possession, it cannot admit of doubt that a bill in equity is the proper mode of obtaining relief, if there is any to which the complainants are entitled. Gage v. Kaufman, 133 U. S. 473, 10 Sup. Ct. 406. The principal ground of the suit is the alleged unconstitutionality of the Wright act, it being contended by the complainants that it not only conflicts with certain provisions of the constitution of the state of California, but also violates that provision of the constitution of the United States which declares that no person shall be deprived of his property without due process of law, and, moreover, provides for the taking of private property for private use.

The act of California under which the proceedings complained of were had provides, in its first section, as amended by the act approved March 20, 1891 (St. 1891, p. 142), that whenever 50 or a majority of the holders of title or evidence of title to lands susceptible of one mode of irrigation, from a common source and by the same system of works, desire to provide for the irrigation of the same, they may propose the organization of a district under the provisions of the act, and, when so organized, such district shall have the powers conferred or that may thereafter be conferred by law upon such irrigation districts. The equalized county assessment roll next preceding the presentation of the petition for the organization of an irrigation district, under the provisions of the act, it is declared, shall be sufficient evidence of title for the purposes of the act. Its second section, as amended by the act of March 20, 1891, is as follows:

"A petition shall first be presented to the board of supervisors of the county in which the lands, or the greatest portion thereof, is situated, signed by the required number of holders of title, or evidence of title, of such proposed district, evidenced as above provided, which petition shall set forth and particularly describe the proposed boundaries of the district, and shall pray that the same may be organized under the provisions of this act. The petitioners must accompany the petition with a good and sufficient bond, to be approved by the said board of supervisors, in double the amount of the probable cost of organizing such district, conditioned that the bondsmen will pay all the said costs in case said organization shall not be effected. Such petition shall be presented at a regular meeting of the said board, and shall be published for at least two weeks before the time at which the same is to be presented, in some newspaper printed and published in the county where said petition is presented, together with a notice stating the time of the meeting at which the same will be presented; and if any portion of such proposed district lie within another county, or counties, then said petition and notice shall be published in a newspaper published in each of said counties. When such petition is presented, the said board of supervisors shall hear the same and may adjourn such hearing from time to time, not exceeding four weeks in all; and on the final hearing may make such changes in the proposed boundaries as they may find to be proper, and shall establish and define such boundaries; provided, that said board shall not modify said boundaries so as to except from the operation of this act any territory within the boundaries of the district proposed by said petitioners which is susceptible of irrigation by the same system of works applicable to the other lands in such proposed district; nor shall any lands which will not, in the judgment of the said board, be benefited by irrigation by said system be included within such district; provided, that any person whose lands are susceptible of irrigation from the same source may, in the discretion of the board, upon application of the owner to said board, have such lands included in said district. Said board shall also make an or-

der dividing said district into five divisions, as nearly equal in size as may be practicable, which shall be numbered first, second, third, fourth, and fifth, and one director. who shall be a freeholder in the division and an elector and resident of the district, shall be elected by each division; provided, that if a majority of the holders of title or evidence of title, evidenced as above provided, petition for the formation of a district, the board of supervisors may, if so requested in the petition, order that there may be either three or five directors, as said board may order. for such district, and that they may be elected by the district at large. Said board of supervisors shall then give notice of an election to be held in such proposed district, for the purpose of determining whether or not the same shall be organized under the provisions of this act. Such notice shall describe the boundaries so established, and shall designate a name for such proposed district, and said notice shall be published for at least three weeks prior to such election in a newspaper published within said county; and if any portion of such proposed district lie within another county or counties, then said notice shall be published in a newspaper published within each of said counties. Such notice shall require the electors to cast ballots, which shall contain the words 'Irrigation District —Yes,' or 'Irrigation District—No,' or words equivalent thereto, and also the names of persons to be voted for to fill the various elective offices hereinafter prescribed. No person shall be entitled to vote at any election held under the provisions of this act, unless he shall possess all the qualifications required of electors under the general election laws of this state."

The third section provides how such election shall be conducted and for the canvass of the vote, and that if, upon such canvass, it appear that at least two-thirds of all the votes cast are "Irrigation District—Yes," the board of supervisors shall, by an order entered on its minutes, declare such territory duly organized as an irrigation district under the name and style theretofore designated, and shall declare the persons receiving respectively the highest number of votes for the several offices, to be duly elected thereto, and shall cause a certified copy of such order to be immediately filed for record in the office of the county recorder of each county in which any portion of such land is situated, and shall also immediately forward a copy thereof to the clerk of the board of supervisors of each of the counties in which any portion of the district may lie, and, from and after the date of such filing, the organization of such district shall be complete, and the officers thereof shall be entitled to enter immediately upon the duties of their respective offices upon qualifying according to law, and shall hold such offices respectively until their successors are elected and qualified. The third section of the act, as amended by that of March 20, 1891, also provides that "no action shall be commenced or maintained or defense made affecting the validity of the organization, unless the same shall have been commenced or made within two years from the making and entering of said order" of the board of supervisors declaring the territory duly organized as an irrigation district. Section 4 et seq. provides for subsequent elections, at which an assessor, a collector, a treasurer, and a board of directors for the district shall be elected. Section 11, as amended March 20, 1891, provides for the organization of the board of directors after their election; and by section 12, as so amended, it is provided that the board shall, among other things, have the right to enter upon any of the land to make surveys, and may locate the necessary irrigation works and the line for any canal or canals, and the necessary

branches for the same, on any of the lands which may be deemed best for such location, and shall also have the right to acquire, either by purchase, condemnation, or other legal means, lands, waters, water rights, and other property necessary for the construction, use, supply, maintenance, repair, and improvements of said canal or canals and works, including canals and works constructed by private owners, land for reservoirs for the storage of needful waters, and all necessary appurtenances, and may also construct the necessary dams, reservoirs, and works for the collection of water for the district, and do any and every lawful act necessary to be done that sufficient water may be furnished to each landowner in the district for irrigation purposes. And it is declared by the twelfth section of the act, as so amended, that the use of all water required for the irrigation of the lands of any district formed under the provisions of the act, together with the rights of way for canals and ditches, sites for reservoirs, and all other property required in fully carrying out the provisions of the act, is a public use, subject to the regulation and control of the state, in the manner prescribed by law. By section 13 it is provided that the legal title to all property acquired under the provisions of the act shall vest in such irrigation district, and shall be held by such district in trust for the uses and purposes therein set forth, and the board of directors is authorized to hold, use, acquire, manage, occupy, and possess the property as provided in the act. By section 15, as amended by an act approved March 20, 1891 (St. Cal. 1891, p. 147), it is provided that, for the purpose of constructing necessary irrigating canals and works, and acquiring the necessary property and rights therefor, and otherwise carrying out the provisions of the act, the board of directors of such district must, as soon after such district has been organized as may be practicable, and whenever thereafter the construction fund has been exhausted by expenditures authorized therefrom, and the board deem it necessary or expedient to raise additional money for such purposes, estimate and determine the amount of money necessary to be raised, and shall immediately thereafter call a special election, at which shall be submitted to the electors of the district possessing the qualifications prescribed by the act the question whether or not the bonds of the district shall be issued in the amount so determined. Notice of such election is required to be given, and such notices are required to specify the time of holding the election, and the amount of bonds proposed to be issued; and, in the event a majority of the votes cast at the election are favorable to the issuance of the bonds, the board of directors are required to immediately cause them to be issued, such bonds to be payable in gold coin of the United States in 10 series, as follows, to wit: At the expiration of 11 years, 5 per cent. of the whole number of said bonds; at the expiration of 12 years, 6 per cent.; at the expiration of 13 years, 7 per cent.; at the expiration of 14 years, 8 per cent;. at the expiration of 15 years, 9 per cent.; at the expiration of 16 years, 10 per cent.; at the expiration of 17 years, 11 per cent.; at the expiration of 18 years, 13 per cent.; at the expiration of 19 years, 15 per cent.; at the expiration of 20 years, 16 per cent.,—all of which

bonds shall bear interest at the rate of 6 per cent. per annum, payable semiannually, on the 1st days of January and July of each year.   Section 16 provides for the sale of the bonds by the board of directors from time to time, in such quantities as may be necessary and most advantageous to raise money for the construction of the canals and works, the acquisition of property and rights, and otherwise to fully carry out the objects and purposes of the act.   Notice of such sale is required to be given, and bids therefor received, but with the provision that in no event shall the board sell the bonds for less than 90 per cent. of the face value thereof.   By section 17 it is provided that the bonds and the interest thereon shall be paid by revenue derived from an annual assessment upon the real property of the district; and all the real property in the district, it is declared, shall be and remain liable to be assessed for such payments, as provided in the act.   Provision is made for the assessment of all such real property annually by the assessor.   By section 20 it is provided that, on or before the first Monday in August of each year, the assessor must complete his assessment book, and deliver it to the secretary of the board of directors, who must immediately give notice thereof and of the time the board of directors, acting as a board of equalization, will meet to equalize assessments, by publication in a newspaper published in each of the counties comprising the district.   The time fixed for the meeting shall not be less than 20 nor more than 30 days from the first publication of the notice, and, in the meantime, the assessment book is required to remain in the office of the secretary for the inspection of all persons interested.   Section 21 is as follows:

"Upon the day specified in the notice required by the preceding section for the meeting, the board of directors, which is hereby constituted a board of equalization for that purpose, shall meet and continue in session from day to day, as long as may be necessary, not to exceed ten days, exclusive of Sundays, to hear and determine such objections to the valuation and assessment as may come before them; and the board may change the valuation as may be just.   The secretary of the board shall be present during its sessions and note all changes made in the valuation of property, and in the names of the persons whose property is assessed; and within ten days after the close of the session he shall have the total values, as finally equalized by the board, extended into columns and added."

Section 22, as amended by the act of March 20, 1891 (St. Cal. 1891, p. 149), is as follows:

"The board of directors shall then levy an assessment sufficient to raise the annual interest on the outstanding bonds, and at the expiration of ten years after the issuing of bonds of any issue must increase said assessment to an amount sufficient to raise a sum sufficient to pay the principal of the outstanding bonds as they mature.   The secretary of the board must compute and enter in a separate column of the assessment book the respective sums, in dollars and cents, to be paid as an assessment on the property therein enumerated.   When collected, the assessment shall be paid into the district treasury, and shall constitute a special fund, to be called the 'Bond Fund of ——— Irrigation District.'   In case of the neglect or refusal of the board of directors to cause such assessment and levy to be made as in this act provided, then the assessment of property made by the county assessor and the state board of equalization shall be adopted, and shall be the basis of assessments for the district, and the board of supervisors of the county in which the office of the board of directors is situated shall cause an assessment roll for said district

to be prepared, and shall make the levy required by this act, in the same manner and with like effect as if the same had been made by said board of directors, and all expenses incident thereto shall be borne by such district. In case of the neglect or refusal of the collector or treasurer of the district to perform the duties imposed by law, then the tax collector and treasurer of the county in which the office of the board of directors is situated must, respectively, perform such duties, and shall be accountable therefor upon their official bonds as in other cases."

By section 23, as amended by the act of March 20, 1891 (St. Cal. 1891, p. 149), the assessment upon real property is made a lien against the property assessed, from and after the first Monday in March for any year, and such lien is not removed until the assessments are paid or the property sold for the payment thereof. Subsequent sections of the act provide that in the event the assessments become delinquent the property shall be sold to pay such assessments, and, in the event the property so sold is not redeemed within 12 months from the sale, the collector or his successor in office is required to make to the purchaser or his assignee a deed of the property, which deed, duly acknowledged or proved, is (except as against actual fraud) made conclusive evidence of the regularity of all the proceedings from the assessment by the assessor, inclusive, up to the execution of the deed, which deed, the statute declares, conveys to the grantee the absolute title to the lands described therein, free of all incumbrances, except when the land is owned by the United States or this state, in which case it is prima facie evidence of the right of possession.

The bill alleges, among other things, that, included within the boundaries of the defendant irrigation district as established by the board of supervisors of San Diego county, within which county the district is situated, is a certain 40-acre tract of land owned by the complainant Maria King Bradley as her separate estate, which is of more than $5,000 in value, and which is known as the southwest quarter of the southeast quarter of section 30, township 9 south, range 3 west of the San Bernardino base and meridian; that, also included within the boundaries of the district as so established, is a certain tract of land known and described as lots 1, 2, 3, and 4, and the east half of the northwest quarter of section 7, township 10 south, range 3 west of the San Bernardino meridian, containing 251.84 acres, which the state of California owned on the 5th day of March, 1885, and which, on that day, the said state contracted to sell to one A. J. Foss, receiving from him 20 per cent. of the purchase price, and issuing to him a certificate of purchase therefor, but that the balance of the purchase price has not been paid, and the state is still the owner of the land, subject to the contract of sale; that, also included within the boundaries of the irrigation district in question, as so established, is a certain other tract of land, containing 80 acres, and known and described as the southeast quarter of the northeast quarter and the northeast quarter of the southeast quarter of section 30, township 9 south, range 3 west of the San Bernardino meridian, which the United States owned on July 7, 1887, and which on that day one Henry Wilbur was allowed to enter as a homestead in the local land office of the United States, pursuant to the provisions of sections 2289 and 2290 of the Revised Statutes of the United States,

but in respect to which Wilbur has never made his final proof, and of which the United States remains the owner, subject to the rights of Wilbur. The bill alleges that the said respective tracts of the United States, of the state of California, and of complainant Maria King Bradley are similarly situated in respect to irrigation facilities, and are equally susceptible of one mode of irrigation, from a common source and by the same system of works. It is therein averred that on the 2d day of July, 1892, an election was held in the defendant irrigation district, at which was submitted to the qualified electors of the district the question whether an assessment of $6,000 should be levied for the purpose of raising money to be applied to the defraying of the expenses of the organization of the district, and for the care, operation, management, repair, and improvement of the property of the district, and the salaries of the officers and employés thereof, which election resulted in the affirmative, and which assessment was afterwards levied, under which, for delinquency, the 40-acre tract of the complainant Maria King Bradley was sold. It is averred that, on the 27th of October, 1891, the board of directors of the defendant irrigation district estimated and fixed upon, as the amount of money necessary to be raised for the purpose of constructing the necessary irrigation canals and works, and acquiring the necessary property and rights therefor, and otherwise carrying out the purposes and provisions of the act in question, the sum of $400,-000, and that, at an election thereafter called to determine whether bonds in that amount should be issued for those purposes, the vote was favorable to the issue of the bonds, after which, on the 5th day of January, 1892, the board of directors ordered that bonds of the district, negotiable in form, be issued, to the amount of $400,000. which order is still in force, and which will be carried into execution, according to the averments of the bill, as soon as purchasers for the bonds can be secured. It is averred that the complainant Maria King Bradley did not sign or join in the petition for the organization of the defendant irrigation district, and that all proceedings in regard to the issuance of bonds and in regard to the assessment were had and taken against her will and consent; that the legislation under which the proceedings were had and taken is in violation of certain provisions of the constitution of the United States, as well as of the constitution of the state of California; that there is no stream or body of water in existence from which the district can obtain water with which to irrigate the lands within the district, but that the district was organized with the intention and sole object of building a dam to catch rain and flood water in the wet season of the year, extending from the month of November to the following May, and to divert such water by means of ditches, flumes, and pipes, and conduct the same to and upon the lands in the district. It is averred that the contemplated dam and other works are intended to be constructed on private property, none of which has been acquired by the district, and that the whole scheme is entirely experimental, uncertain, and problematical, and that all of the money to be raised by the sale of the bonds so authorized to be issued, and which, when issued, will constitute a lien upon all of the land within the district, may be ex-

pended by the district without obtaining any water for the irrigation of the land therein. It is averred that the defendant irrigation district was organized for the purpose of supplying the aforesaid 241.84-acre tract owned by the state of California, and the aforesaid 80-acre tract owned by the United States, with water for irrigation, and that the board of directors of the district, in estimating and determining the amount of bonds necessary to be issued, made such estimate and determination upon the basis that it would be necessary to construct works and acquire water rights sufficient to irrigate all of the lands in the district, including the 80 and 251.84-acre tracts, and that the estimated costs of the works, and that the amount of bonds necessary to be issued, were increased at least $9,000 by reason of those two tracts being included. It is alleged that the actual cash value of the 251.84-acre tract is not less than $7,500, and that the actual cash value of the 80-acre tract is not less than $5,000, and that the actual cash value of all of the land within the district, including the improvements, does not exceed $400,000.

A demurrer interposed by the defendants raises the question of the sufficiency of the bill, which, in turn (the proceedings being regular), depends upon the validity of the legislation under which the proceedings were had. Its invalidity is asserted by the complainants, upon the grounds, among others, that it provides for the taking of private property without due process of law, contrary to the provisions of the fourteenth amendment of the constitution of the United States, and that the use for which such property is thereby authorized to be taken is not a public use. Similar objections to the legislation were urged in some, if not in all, of the cases involving its validity that were determined by the supreme court of California, and were by that court held not well taken. Irrigation Dist. v. Williams, 76 Cal. 360, 18 Pac. 379; Irrigation Dist. v. De Lappe, 79 Cal. 352, 21 Pac. 825; Crall v. Irrigation Dist., 87 Cal. 140, 26 Pac. 797; Board of Directors v. Tregea, 88 Cal. 334, 26 Pac. 237; In re Madera Irr. Dist., 92 Cal. 296, 28 Pac. 272, 675. While the decisions of that court in those, as well as in all other, cases are justly entitled to great respect, this court is not at liberty to decline to exercise its own independent judgment in determining whether any state legislation violates a provision of the constitution of the United States. Nor can the decision of any state court be conclusively binding upon any federal court in respect to the question whether or not the use on behalf of which the power of the state is sought to be exercised is of such a nature that it can be legally exercised. "Its solution," said the supreme court, in Olcott v. Supervisors, 16 Wall. 678, "must be sought, not in the decisions of any single state tribunal, but in general principles common to all courts. The nature of taxation, what uses are public and what are private, and the extent of unrestricted legislative power, are matters which, like questions of commercial law, no state court can conclusively determine for us." Nor does the legislative declaration found in the act here in question that the use in relation to which the authorized power is to be exercised is a public use, necessarily make it so. Cooley, Const. Lim. (5th Ed.) p. 666, and cases there cited. If it did, the constitutional provision

that private property may be taken for a public use, and the converse of this,—which is everywhere maintained by all courts, and which nobody doubts, that private property cannot be taken for a private use,—might, as said by counsel for complainants, just as well not exist. It is the purpose and use of a work which determine its character. Olcott v. Supervisors, supra. Streets and highways are in their nature public; for the very purpose of their construction is the accommodation of the public, to the use of which every person is entitled upon the same terms and conditions as every other person. Water appropriated or designed for the use of cities and towns becomes charged with a public use; for the very purpose of such appropriation is the supplying of the public with that necessary element, and every person within such cities and towns is entitled to it upon precisely the same terms and conditions. So, also, in dry and arid regions, like many and great sections of California, where water is their very life blood, is water appropriated or designed for the use of the public for purposes of irrigation. See, in this connection, Osgood v. Mining Co., 56 Cal. 571; my dissenting opinion in Lux v. Haggin, 69 Cal. 442, 10 Pac. 674, and Live Stock Co. v. Booth, 102 Cal. 151, 36 Pac. 431. But can this be properly said in respect of a district, however extensive its boundaries, where only certain persons are entitled to enjoy the use,—that is to say, where only the landowners in the district are entitled to the use? Such landowners may be many in number, or they may be few. It is manifest, however, that the character of the use is not to be tested by the mere number of persons who may enjoy it. No man's property can be constitutionally taken from him without his consent, and transferred to certain other men for their use, however numerous they may be. And that is just what the legislation in question authorizes to be done. Private property is thereby authorized to be assessed and sold to provide water to supply the landowners in a certain district, more or less limited in extent, for irrigation purposes. Every person within such district is not entitled to the use of the water so provided upon the same terms and conditions as every other person, but only those persons who happen to own land in the district. Of course, the property of those individuals would thereby be improved, and, indirectly, the public good be thereby advanced. But every improvement advances the public good. Every enterprise, no matter how strictly private it may be, if it be lawful, and adds to the wealth, comfort, and happiness of the people, is for the public good. The building of a house, or the planting of a useful or beautiful tree, is for the public good. But surely private property cannot be taken against the owner's consent, on the ground that the public interest would be thus promoted. Judge Cooley, in his work on Constitutional Limitations (5th Ed., p. 658). says it is not important "that the public would receive, incidentally, benefits such as usually spring from the improvement of lands or the establishment of prosperous private enterprises. The public use implies a possession, occupation, and enjoyment of the land by the public at large or by public agencies, and a due protection of private property will preclude the government from seizing it in the hands of the

owner and turning it over to another on vague grounds of public benefit to spring from the more profitable use to which the latter may devote it." And, after referring to the statement of a learned jurist that, "if the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain, and to authorize an interference with the private rights of individuals for that purpose," says:

"It would not be entirely safe, however, to apply with much liberality the language above quoted, that 'where the public interest can be in any way promoted by the taking of private property' the taking can be considered for public use. It is certain that there are very many cases in which the property of some individual owners would be likely to be better employed or occupied to the advancement of the public interest in other hands than in their own, but it does not follow from this circumstance alone that they may rightfully be dispossessed. It may be for the public benefit that all the wild lands of the state be improved and cultivated, all the low lands drained, all the unsightly places beautified, all dilapidated buildings replaced by new, because all these things tend to give an aspect of beauty, thrift, and comfort to the country, and thereby to invite settlement, increase the value of lands, and gratify the public taste; but the common law has never sanctioned an appropriation of property based upon these considerations alone, and some further element must, therefore, be involved before the appropriation can be regarded as sanctioned by our constitutions. The reason of the case and the settled practice of free governments must be our guides in determining what is or is not to be regarded a public use; and that only can be considered such where the government is supplying its own needs, or is furnishing the facilities for its citizens in regard to those matters of public necessity, convenience, or welfare which, on account of their peculiar character, and the difficulty—perhaps impossibility—of making provision for them otherwise, it is alike proper, useful, and needful for the government to provide. Every government is expected to make provision for the public ways, and for this purpose it may seize and appropriate lands. * * * The government also provides courthouses for the administration of justice, buildings for its seminaries of instruction, aqueducts to convey pure and wholesome water into large towns. It builds levees to prevent the country being overflowed by the rising streams. It may cause drains to be constructed to relieve swamps and marshes of their stagnant water. And other measures of general utility, in which the public at large are interested, and which require the appropriation of private property, are also within the power, where they fall within the reasons underlying the cases mentioned."

Can it be properly held that within the reasons that underlie any of the cases in which private property may be taken for a public use falls the case where it is sought to take such property in order to supply water only to certain individuals within a certain district? I think not. The property to be held by the corporation whose creation is provided for by the legislation in question is not, as said by the supreme court of California in Re Madera Irr. Dist., 92 Cal. 322, 28 Pac. 272, 675, to be held "in trust for the public," but in trust for the landowners of the district, and for nobody else. Manifestly, they do not constitute the public, whether they number many or few; and for their exclusive use the private property of no man can be taken without his consent. "To lay, with one hand," said the supreme court of the United States, in Association v. Topeka, 20 Wall. 655, "the power of the government on the property of the citizen, and with the other bestow it on other individuals to aid

private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation." In Cummings v. Peters, 56 Cal. 593, it was held that several owners of mines could not condemn a right of way for a ditch through which to convey water to work their mines, because the use was a private one, being limited to specific individuals, and not intended for the general public. Precisely the same thing is true in respect to the legislation in question. It is wholly imma-terial whether the specific individuals are named or are designated as the owners of the lands within the district, or whether they number a half dozen only, or as many hundred. The important and controlling fact in respect to this point is that, in the case at bar, as in the case of the mine owners referred to in 56 Cal. 593, the use of the water is limited to specific individuals, and the interest of the public is nothing more than that indirect and collateral benefit that it derives from every improvement of a useful character that is made in the state.

In Re Pequest River, 41 N. J. Law, 175, Chief Justice Beasley, speaking for the court of errors, in respect to a state statute which he explained as designed to enable one set of landowners to compel another set to co-operate, against their will, to drain that body of meadow land in which they had separate interests, said:

"The persons thus coerced manifestly suffer an invasion of their ordinary proprietary rights. Why should they thus be forced either to improve their own land or help to improve the land of others? It cannot reasonably be contended that this burden must be borne because the improvement is a public one. This was the view of the effect of this act expressed in the case of In re Drainage of Lands, 35 N. J. Law, 497; but, as such view was founded on the notion that a legislative requisition that private lands should be drained at the expense of their owners was an exercise of power similar in kind to a proceeding to condemn private property for the uses of a public road, I am compelled to think that decision rests upon a basis that is man-ifestly indefensible. I can see no rational ground for the assumption that the schemes to be executed by this act are, in the main, matters which, in any just sense, can be said to be of public concern. It is true that, under certain conditions, the reclamation of very extensive tracts of land which are subject to overflows by the tides, or which are otherwise submerged, may assume the importance of a public undertaking. Such was the case pre-sented in the litigation between Tidewater Co. v. Coster, 18 N. J. Eq. 519. Such would be the case if the condition of a tract of land was such as to be detrimental to the public health. But the law is not confined to such cases as these, for its scope embraces every case of a tract of meadows, no matter how small its area, which is distributed among as many as five separate owners. It is extremely plain, therefore, that the legislative purpose em-bodied in this act cannot be vindicated on the plea that it directly conduces to the general welfare of the community. It does not seem open to question that it is the owners alone who are interested in the compulsory improvement of these lands. True, in such cases there is a resulting gain to the public, but this is nothing more than the inevitable incident of individual prosperity. The effect of drainage is to cause a more plentiful product than the land would yield in its unreclaimed condition. In this result the owner is directly interested, the community indirectly only, and it is a perversion of legal terms to call the enterprise, on account of such collateral advantage, a public one. So false is such a contention that, if yielded to, it would legalize the com-pulsory establishment of manufactories, or the converting of forests into ara-ble land, or the execution of any private enterprise whatever, as in all such matters the state has a remote interest. To call the legislative fiat that a half-dozen persons shall drain their land at their joint expense and for their

private advantage an exercise of the taxing power of the state is, in my judgment, simply a misnomer. Nor is such an exercise of power any more justifiable, if it is to be derived merely from the nature of the legislative authority, than would be an enactment commanding A. and B. to farm their several lands at their joint expense; and yet no one will pretend that this can be done. Under a constitution that guaranties the inviolability of private property, and limits the lawmaking power to the function of legislation, it appears to me entirely inadmissible to claim that it is a legitimate use of the prerogative to legislate, to enact a law such as the present one, requiring a few landowners to improve their lands for their own profit and at their own expense. I regard it as a clear infringement of the constitution to take, by force of a statute, the money of a person from him, even though such money should, against his will, be used for his private benefit, in the improvement of his land. Such an act has nothing in common, with respect to legal principles, with the condemnation of property for the uses of the community, and to the charging, to a limited extent, of the costs of such improvement upon the landowners specially benefited. I cannot assent to the hypothesis that this law can rest on the state's right to tax, or on its eminent domain."

Like the case last cited, the scope of the legislation under consideration is not limited to cases where the territory designed to be supplied with water for irrigation is so extensive as to assume the importance of a public undertaking, and where, when provided, the water is available to every person within the district upon the same terms and conditions, but it embraces every case where a tract of country, be it large or small, is susceptible of one mode of irrigation from a common source and by the same system of works, and a majority of the holders of title or evidence of title thereto petition for the organization of an irrigation district, and two-thirds of the qualified voters within the boundaries of the district as established by the board of supervisors vote in favor of it. A half-dozen persons, as well as as many hundred, may constitute a majority of the holders of title or evidence of title to the lands falling within the designation of the statute, and the water to be secured by the means provided for, so far from being available to every person within the district, upon the same terms and conditions, is limited to the use of specific individuals, namely, the landowners of the district.

Another fatal objection to the maintenance of the legislation here in question, under the right of eminent domain, is that, if it be regarded as undertaken by the public primarily as a matter of public concern, the assessment upon the landowners must be limited to benefits imparted, which is not the case with this statute. Wurts v. Hoagland, 114 U. S. 613, 5 Sup. Ct. 1086; Tide-Water Co. v. Coster, 18 N. J. Eq. 527. It does not seem to me to admit of doubt that, if the act in question can be maintained at all, it must be under the power of assessment for local improvements, or, as expressed by the supreme court in Wurts v. Hoagland, supra: "The power of the legislature to establish regulations by which adjoining lands, held by various owners in severalty, and in the improvement of which all have a common interest, but which, by reason of the peculiar natural condition of the whole tract, cannot be improved or enjoyed by any of them without the concurrence of all, may be reclaimed and made useful to all at their joint expense." But no more than any other can that power be exercised without "due process of law." Not only does the legislation in question provide

for the assessing and selling, and thus for the taking, of private property, in order to supply water for irrigation to specific persons within the district, and to those only, but all of this is authorized to be done without affording the owner any opportunity to be heard in opposition to the validity of the proceedings. As has been seen, the act provides, as a condition precedent to the organization of the district, the presentation to the board of supervisors of the county in which the lands or the greater portion thereof are situated, at a regular meeting of such board, of a petition signed by 50 or a majority of the holders of title or evidence of title to lands susceptible of one mode of irrigation, from a common source and by the same system of works, as shown by the equalized county assessment roll next preceding the presentation of the petition, which petition shall specifically describe the proposed boundaries of the district and ask that it be organized under the provisions of the act. The supreme court of California said, in the Madera Irr. Case, 92 Cal. 323, 28 Pac. 272, 675, in answer to the present objection to the act, that the proceeding for the organization of the district—

"Does not affect the property of anyone within the district, and that he is not, by virtue thereof, deprived of any property. Such result does not arise until after the delinquency on his part in the payment of an assessment that may be levied upon his property, and before that time he has opportunity to be heard as to the correctness of the valuation which is placed upon his property, and made the basis of his assessment. He does not, it is true, have any opportunity to be heard otherwise than by his vote in determining the amount of bonds to be issued, or the rate of assessment with which they are to be paid; but in this particular he is in the same condition as is the inhabitant of any municipal organization which incurs a bonded indebtedness or levies a tax for its payment. His property is not taken from him without due process of law, if he is allowed a hearing at any time before the lien of the assessment thereon becomes final."

A hearing as to what? The only hearing provided for by the statute is as to the correctness of the valuation put by the assessor upon the property assessed. Nor can I at all agree that the proceeding for the organization of the district "does not affect the property of any one within the district." The petition for the organization of the district was the foundation of the whole proceeding, just as the petition for the opening of Montgomery avenue, in San Francisco, lay at the foundation of the proceedings involved in Mulligan v. Smith, 59 Cal. 206, the ruling in which case was approved by the supreme court of the United States in Zeigler v. Hopkins, 117 U. S. 687, 688, 6 Sup. Ct. 919. Without the required petition, no step could be taken looking to the organization of the district here in question. It was jurisdictional in the strictest sense. Two weeks' notice of the time of presentation of the petition is required to be given by publication. When presented, the statute declares the board of supervisors—

"Shall hear the same, and may adjourn such hearing from time to time, not exceeding four weeks in all, and, on the final hearing, may make such changes in the proposed boundaries as they may find to be proper, and shall establish and define such boundaries; provided, that said board shall not modify said boundaries so as to except from the operation of this act any territory within the boundaries of the district proposed by said petitioners which is susceptible of irrigation by the same system of works applicable to other

lands in said proposed district, nor shall any of the lands which will not, in the judgment of said board, be benefited by irrigation by said system, be included within such district; provided, that any person whose lands are susceptible of irrigation from the same source may, in the discretion of the board, upon application in writing to said board, have such lands included in such district." Laws 1887, p. 30.

Notwithstanding the fact that the petition is by the statute made the basis of the proceeding which is to culminate in divesting the title of the owner of land against his consent, there is here not only no opportunity afforded such owner to test the sufficiency of the petition, but the power of the board of supervisors is in terms limited to making such changes in the boundaries proposed by the petitioners as it may deem proper, subject to the condition that it shall not except from the operation of the act any territory within the boundaries proposed by the petitioners which is susceptible of irrigation by the same system of works applicable to the other lands in said proposed district, nor include within the boundaries, which it is required to establish and define within four weeks after the presentation of the petitioner, any lands, which, in its judgment, will not be benefited by irrigation by the same system of works. Every one must admit that in the matter in question the board of supervisors has only such power as is expressly or by necessary implication conferred upon it by the statute itself. Not only is it not thereby given the power to inquire into the sufficiency of the petition, but the express statutory requirements preclude any such inquiry by it, at the instance of any owner of land adversely affected, or at all. Yet the petition may not have been signed by the required number of holders of title or evidence of title to lands within the district, and, if not, there was no basis upon which the proceedings could rest. Whatever construction might otherwise be placed upon the word "hear," used in the statute, it cannot be held to include the power to determine the entire merits of the petition, in view of the affirmative requirement contained in the same sentence that on its final hearing the board "shall establish and define such boundaries." The board is of necessity required to determine for itself whether the petition upon its face is sufficient to put its powers in motion; yet its determination in that respect is not conclusive upon any one. As said by Judge Bronson, in speaking of a similar petition, in Sharp v. Speir, 4 Hill, 88:

"They could not make the occasion by resolving that it existed. They had power to proceed if a majority petitioned, but without such a petition they had no authority whatever. They could not create the power by resolving that they had it."

The statute does not require or authorize the board of supervisors to hear any contest in respect to the truth of the allegations of the petition, further than is implied by the provision that it may make such changes in the proposed boundaries as it may deem proper. Had it been impowered to entertain a contest, for example, by a landowner in respect to the question whether those signing the petition were, in truth, the holders of title or the evidence of title to lands susceptible of one mode of irrigation, from a common source and by the same system of works, and it should find in favor of the

contestant upon that issue, it would necessarily be obliged to deny the petition and dismiss the proceedings. Yet, so far from that course being allowed by the statute, it provides, as has been seen, that the board of supervisors shall hear the petition, and may adjourn such hearing from time to time, not exceeding four weeks in all, and, in express terms, declares that on the final hearing of such petition it may make such changes in the proposed boundaries as it may find to be proper, and shall establish and define such boundaries. After the board of supervisors shall have so established and defined the boundaries of the proposed district, and shall have divided it into divisions, the board is, by the statute, required to give notice of an election to be held in such proposed district for the purpose of determining whether or not the same shall be organized under the provisions of the act. The notice is required to describe the boundaries so established, and to designate a name for such proposed district. In the event two-thirds of the votes cast at such election are in the affirmative, the board of supervisors is by the statute required to declare, by an order entered on its minutes, such territory duly organized as an irrigation district under the name and style theretofore designated, and to declare the persons receiving respectively the highest number of votes for the several offices to be duly elected thereto, and to cause a certified copy of such order to be immediately filed for record in the office of the county recorder of each county in which any portion of such land is situated, and to also immediately forward a copy thereof to the clerk of the board of supervisors of each of the counties in which any portion of the district may lie. And the statute declares that, from and after the date of such filing, the organization of such district shall be complete, and the officers thereof shall be entitled to enter immediately upon the duties of their respective offices, upon qualifying according to law, and shall hold their respective offices until their successors are elected and qualified. The organization of the district is thus completed, according to the statute, without at any time or place affording the owner of any land within the boundaries of the district the opportunity to question or contest the sufficiency of the petition which lay at the very foundation of the whole proceedings. After the organization of the district has been so completed, its subsequent management and control are, by the statute, placed in the hands of the officers of the district, whose assessor is required to annually assess all the lands within the district to pay the costs of the irrigation works, the salaries of its officers, etc., and the principal and interest of such bonds of the district as may have been authorized to be issued, and which, by the statute, are made a lien upon all of the lands within the district. The assessments so made are, by the statute, required to be equalized by the board of directors of the district, sitting as a board of equalization, notice of which is required to be given by publication, which board is required to meet at the time designated in the notice, and to continue in session from day to day as long as may be necessary, not to exceed 10 days, exclusive of Sundays, to hear and determine such objections to the valuation and assessment as may come

before them. The board of directors, sitting as a board of equalization, is given the power to change the valuation as may be just, and its secretary is required to note all changes made in the valuation of the property assessed, and in the names of the persons whose property is assessed. The board of directors is then required to levy an assessment sufficient to raise the required amount of money, which is made a lien upon the property assessed, and, in the event of delinquency, the property is directed to be sold by the collector of the district to pay the assessment, and, if not redeemed within 12 months from sale, the collector, or his successor in office, is required to execute a deed to the purchaser, the consequences attaching to which deed have already been stated. From first to last, .at no time or place is the owner of land within the district given the opportunity to be heard in respect to the essential and all-important question whether the petition upon which all of the proceedings rest, and under which his property is to be assessed, sold, and conveyed, conforms to the requirement of the statute,—whether it was, in fact, signed by 50 or a majority of the holders of title or evidence of title to lands within the district, as shown by the last equalized assessment roll immediately preceding the presentation of the petition. Without such a petition, as has been said, no step could be taken looking to the organization of the district (Mulligan v. Smith, 59 Cal. 206; Zeigler v. Hopkins, 117 U. S. 688, 6 Sup. Ct. 919); and, of course, without a legally organized district, there can be no such thing as an assessment. To say, therefore, as did the supreme court of California in the Madera Irr. Case, that the landowner "has opportunity to be heard as to the correctness of the valuation which is placed upon his property and made the basis of his assessment," does not at all answer the objection. That hearing, as stated by that court, was limited to the question of the correctness of the valuation placed by the assessor upon the assessed property. It did not, and could not, under the terms and provisions of the statute, reach the vital question of the sufficiency of the petition. With that the directors of the district, sitting as a board of equalization, had nothing whatever to do. So that, under the provisions of the statute in question, the land of an individual may be assessed and sold, and, according to the averments of the bill, will, unless the court intervenes, be conveyed, and thus taken, without affording its owner any opportunity whatever to question the sufficiency of the petition upon which the whole proceedings are based. That this would be to deprive such owner of his property without due process of law would seem to be very clear. In judging what is "due process of law," said the supreme court of the United States, in Hagar v. Reclamation Dist., 111 U. S. 708, 4 Sup. Ct. 663:

"Respect must be had to the cause and object of the taking, whether under the taxing power, the power of eminent domain, or the power of assessment for local improvements, or some of these; and. if found to be suitable or admissible in the special case, it will be adjudged to be 'due process of law'; but, if found to be arbitrary, oppressive, and unjust, it may be declared to be not 'due process of law.' "

Is it not arbitrary, oppressive, and unjust to take one's property without affording him any opportunity to show the insufficiency of the very thing that forms the basis of the proceedings under which the taking is to occur,—without allowing him to show that the petition required by the statute as a condition precedent to the organization of the district, without which there could be no district, no assessment, no sale, no conveyance, never, in fact, existed? Surely, upon that vital, all-important question, the owner is entitled to be heard; and, just as surely, to take his property without affording him that opportunity is arbitrary, oppressive, and unjust. Assessments in California for the purpose of reclaiming overflowed and swamp lands, to which the supreme court of California, in the cases cited, likened the irrigation districts, are enforced by suits in which, as held by the supreme court of the United States in Hagar v. Reclamation Dist., supra, the owner may set up, by way of defense, all his objections to the validity of the proceedings, and he is, therefore, in such proceedings, afforded "due process of law." In the present case, however, as has been shown, the owner whose property is authorized to be taken is not afforded any opportunity whatever, at any time or place, before any board or tribunal, to question the sufficiency of the very thing that lies at the foundation of the whole proceedings. This vital objection to the legislation in question is in no manner answered by the fact that, by a supplemental act of the legislature of California approved March 16, 1889 (St. Cal. 1889, pp. 212, 213), the board of directors of any irrigation district is authorized to commence a special proceeding in a superior court of the county in which the lands or some portion thereof are situated, in which, after the publication of notice of the proceeding, any person interested may come in and contest the legality and validity of "each and all of the proceedings for the organization of said district under the provisions of the said act, from and including the petition for the organization of the district, and all other proceedings which may affect the legality or validity of said bonds and the order for the sale and the sale thereof." Such a proceeding may or may not be instituted by the board of directors of the district, and was not instituted in the present instance, so far as appears from the bill. No man's constitutional rights can depend upon an option which may or may not be exercised by another.

Apart from the objections already considered, which go to the validity of the statute itself, it would be difficult, I think, if not impossible, to sustain its applicability to a case where there is no stream or body of water in existence from which the district can obtain water with which to irrigate the lands within the district, and where, according to the averments of the bill, the proposition is to take private property to build works to catch and distribute, for the purposes of irrigation, rain and flood water, which may or may not come in sufficient volume. It would seem quite unreasonable to hold that private property can be taken for any such experimental purpose,—especially where, as here, according to the allegations of the bill, one piece of land within the district designed to be thus irrigated belongs to the United States and another to the state of California, both of

which are exempt from assessment, but whose inclusion for irrigation purposes adds $9,000 to the amount for which bonds have been authorized, and which, when issued, will be a lien upon the property of the complainant Maria King Bradley, and under which it may be sold and conveyed. The fact that vast sums of money have been invested in works constructed under and in pursuance of this legislation, and that bonds running into the millions have been issued and sold thereunder, and that many individuals may not otherwise be able to secure water for the irrigation of their respective tracts of land, and that the validity of the legislation has been several times sustained by the supreme court of the state, while demanding on the part of this court great care and caution in the consideration of the case, and casting upon it a very grave responsibility, cannot justify it in failing to declare invalid legislation which, in its judgment, violates those principles of the constitution of the United States which protect the private property of every person against forcible taking without due process of law and for any other than a lawful purpose. Such questions are not to be determined by considerations of expediency or hardship. Unfortunate as it will be if losses result to investors, and desirable as it undoubtedly is, in this section of the country, that irrigation facilities be improved and extended, it is far more important that the provisions of that great charter, which is the sheet anchor of safety, be in all things observed and enforced. The views above expressed render it unnecessary to consider other objections urged on the part of the complainants. Demurrer overruled, with leave to the defendants to answer within the usual time.